# PEOPLE *ex rel.* v. GREEN.

*(Supreme Court of Colorado, March 14th, 1884—On Petition for Rehearing
—see Opin. ante., p. 473.)*

1. PROCEEDINGS FOR CONTEMPT AND DISBARMENT—DISTINCTION BE
TWEEN. Proceedings for contempt, may be termed a police regulation or
power for the protection of the Court from present direct interference and
annoyance in a trial or proceeding taking place before it, while proceedings
for the disbarment of an attorney, are intended to protect generally the
administration of justice, to save the legal profession from degradation by
unworthy membership, and to guard the interests of litigants against injury from those intrusted with their legal business.

2. SAME—SAME—PROCEEDINGS UPON. The power to act in connection
with contempt, is lodged with the Court before or against whom the offense is committed. Authority for proceeding in disbarment is possessed
exclusively by the tribunal authorized to grant licenses admitting to the
profession. The former is punished by fine or imprisonment, and may be
largely *ex parte.* The sole penalty in connection with the latter is a prohibition from practicing in the Courts of record. and this judgment can only
be entered upon notice of charges preferred, and opportunity for defense.
A contempt may constitute a ground for disbarment; but it by no means
follows that the cause for disbarment must, in all cases, constitute a contempt.

3. OFFICIAL MISCONDUCT BY AN ATTORNEY. If a judge and attorney
meet outside the court room and engage in an altercation about some
matter in no way connected with judicial action, they are, and ought to be,
upon precisely the same footing, in all respects, as other private citizens;
but when the attorney utters a threat against, or makes an assault upon a
judge on account of a ruling or decision in court, the situation is entirely
different. His action, in such case, has a direct influence on the judicial
mind. It is calculated to disturb and embarrass the proper administration
of justice. The temple in which a lawyer is sworn to minister, is not
bounded by the walls of the court room; his official oath is not a cloak to
be worn only in the presence of the court, and when he, by wilful misconduct toward a judge on account of judicial acts, interferes with or impedes
the dignified and proper administration of the law, or is guilty of conduct which tends to do so, whether in the court room or on the street,
he is guilty of official misconduct.

HELM, J. The importance of this case, and novelty of at
least one question presented, must be my excuse for re-stating,
upon this application, our views somewhat in detail.

The complaints embodied in respondent's petition concerning
his treatment in this Court, are, in our judgment, groundless.

He was given full notice of the charges preferred, and ample
time to prepare his pleadings. The process of the Court for

procuring the attendance of witnesses was placed at his disposal; he was awarded a trial in open Court, and the time was fixed to suit his convenience as well as that of relator; at the trial he was represented by able counsel, who managed his case with consummate ability; he was given the privilege of conducting the same in person; and after electing to leave the general management to his lawyers, he was permitted to address the Court himself upon the argument. Evidence supporting his allegations as to relator's oppressive treatment of third parties, was excluded, but all proofs that were deemed proper, either in mitigation or in justification, were received and considered; and every doubt concerning the admission or rejection of testimony was resolved in his favor.

Upon this petition for rehearing, though an adjournment of the Court for two weeks had taken place, he was, at his request, accorded the privilege of being heard by the Judges at chambers, in oral argument, both in person and by counsel.

Throughout these entire proceedings, the Court has adhered to its resolution, that errors committed, if any, should be in his favor and not against him. And now, upon a candid and careful review of the case, we cannot see where a single right has been abridged, a courtesy omitted, or a reasonable request denied him.

The relator, in this case, is Judge of the Second Judicial District of the State; his petition, among other things, contains the following averments: That, "about 9 o'clock a. m., of said December 1st, your petitioner and his daughter, a young girl about sixteen years of age, were riding along Curtis street, in the city of Denver, when they met Mr. Green, to whom your petitioner spoke and bowed politely, and, at Mr. Green's request, stopped, when the following colloquy, in substance, took place; Mr. Green said:

" 'Did you have that article published in the paper about me?'

"To which your petitioner answered:

" 'No sir; I did not.'

"Mr. Green replied:

" 'If you did, an explanation has got to be made; I will not stand it. Perhaps your clerks caused it to be published at your instigation,' or words to that effect.

"Your petitioner again said:

" 'I have told you that I had nothing to do with causing that publication; and that is all I can say.'

"Your petitioner then started to drive on, when Mr. Green said:

" 'Wait a minute; I was going up to your house.'

"Your petitioner again stopped, and Mr. Green continued, addressing your petitioner, and intending thereby to embarrass and intimidate your petitioner in the discharge of his official duties, saying in substance:

" 'I shall publish the whole affair; how you got angry upon the bench; how you imprisoned those poor men, and took money out of their pockets; you ought to have given us an honest judge to try the case; you are a tyrant upon the bench, but when you are attacked upon the street you are a coward, and dare not defend yourself. I will make it hot for you, you cowardly puppy.'

"Mr. Green said much more to the same effect, using and repeating the most offensive and insulting epithets to your petitioner, concerning your petitioner's official conduct. During this abusive tirade, your petitioner made no reply, except remarking once or twice in a cool and indifferent manner:

" 'Very well, Mr. Green, publish as much as you please, and put it all in the newspaper, if you think it will do you any good.'

"And then your petitioner drove on, leaving Mr. Green talking offensively and excitedly." *      *      *      *      *

In answer to the foregoing, respondent admits that his conduct and language, upon the street, were "in substance as reported by said Elliott in said petition."

There is, therefore, no dispute whatever concerning the language used by both parties upon the occasion referred to; neither is there controversy about any of the attendent circumstances; admitting all that is charged, except as to his intention at the time, respondent declares that he was guilty of no official misconduct, and demands at the hands of this Court, vindication from the charge of malconduct in office.

The purpose of proceedings for contempt and those for disbarment, and the powers and duties of Courts in connection therewith, must not be confused. The former may be termed

a police regulation or power, for the protection of the Court from present direct interference and annoyance in a trial or proceeding taking place before it; the latter is intended to protect, generally, the administration of justice, to save the legal profession from degradation by unworthy membership, and to guard the interests of litigants against injury from those entrusted with their legal business. The power to act in connection with the former is lodged in the Court before or against whom the offense is committed; authority to proceed in the latter is possessed exclusively by the tribunal authorized to grant licenses admitting to the profession; the former is punished by fine or imprisonment, and in many instances the proceeding is summary and largely *ex parte;* the sole penalty in connection with the latter, is a prohibition from practicing in courts of record, and this judgment can only be entered upon notice of the charge preferred and a full hearing in defense, ample time for preparation being given and all legitimate testimony being allowed and considered. A contempt may constitute ground for disbarment, but it by no means follows that the cause for disbarment must, in all cases, constitute a contempt.

Upon some of the questions connected with the subject of disbarment, there is conflict of opinion among the decisions. The tendency has been, and is, to exercise the power only in extreme cases, and upon the most careful and thorough consideration. A few of the authorities go so far as to denominate the attorney's right to practice his profession, property, and to treat the same according to the full significance of that term.

Whether this position be correct or not, the disposition of the Courts to afford him all reasonable protection in the proper exercise of this right, deserves and receives the hearty commendation of all just and intelligent minds. But Courts ought not to forget, in their anxiety to shield the attorney, the duty they owe to themselves, to the legal profession in general, and to that portion of society with whom they directly deal.

This case cannot be determined as a single controversy between two individuals. The questions are of general importance and application. Every other judge, and every other lawyer is almost as much interested as are relator and respond-

ent. Individuals are lost sight of. The issue tried, bears directly upon the relations existing between the bench and bar of the entire State.

Before admission to the bar, in Colorado, applicants are required to present credentials of good moral character, and of intellectual fitness for the office. When admitted, they become sworn officers of the law. Each subscribes to an oath, that he will, "in all things, faithfully execute the duties of an attorney and counsellor at law, according to the best of his understanding and abilities." Their tenure of office is for life, or during good behavior. Every license is accepted with full knowledge of the unwritten condition annexed thereto, that for official misconduct it may be revoked at any time.

The power of revocation is, by statute, lodged in this Court; and if upon a proper case we should hesitate to assume the grave responsibility, and perform the unwelcome duty, we would be untrue to our official oath.

Under this oath, can we grant Mr. Green's request and vindicate him from all blame as a lawyer? Are we prepared to declare to the world, that in this State every attorney who may imagine himself aggrieved by a judicial ruling, may, on account thereof, insult the Judge upon the street, using the vilest epithets, and making the most violent threats, concerning, or affecting the past and future performance of his judicial duties? Nay, more, are we willing to admit that he may couple with such assault, physical violence, (for there is no distinction in principle between the two offenses, so far as this question is concerned;) that he may repeat such assaults, verbal or physical, upon each and every adverse decision; and that no power exists to interfere with, or to prevent these offenses by disbarment?

Ordinary civil or criminal actions, are remedies utterly inadequate. Their official relations bring the parties into continual contact. The Judge is compelled to make rulings from day to day, upon questions presented by the attorney. His rulings in that capacity are judicial findings, for errors in which ample relief is provided. An insult, or an injury inflicted upon him, on account thereof, is an insult or an injury to the cause of justice, and, if by a lawyer, also to the legal profession.

If a judge and attorney meet outside the court room, and engage in an altercation about some matter in no way connected with judicial action, they are, and ought to be, upon precisely the same footing, in all respects, as other private citizens; but when the attorney utters the threat, or makes the assault on account of a ruling or decision in Court, the situation is widely different. His action has a direct influence upon the judicial mind; it is calculated to disturb and embarrass the proper administration of justice. The temple in which the lawyer is sworn to minister, is not bounded by the walls of a court room; his official oath is not a cloak to be worn only in presence of the Court; and when he proves recreant to that oath by such willful misconduct towards the Judge, on account of his judicial acts, as interferes with, or impedes the dignified and proper administration of the law, or tends to do so, whether in the court room or upon the street, *he is guilty of official misconduct.* Whether such misconduct justifies disbarment, depends, of course, upon the facts and circumstances attending and surrounding each particular case.

But in this country, and in England also, the utmost liberty of speech is guaranteed by statute and enforced by the Courts; the right to discuss all matters of public interest or importance is everywhere fully recognized; judicial decisions and conduct constitute no exception to the rule; the Judge's official character and his acts in cases fully determined, are subject to examination and criticism; in most of the States the office is elective, and it is proper and right that the people should be informed of the occupant's mental and moral fitness.

True, under the guise of criticism in the public press and otherwise, Judges are often compelled to endure the sting of misrepresentation and calumny with no other redress than an ordinary civil action; and doubtless it sometimes happens that their efficiency in office is thereby lessened, to the detriment and injury of the public service; but it is wisely considered better that these wrongs and injuries should be tolerated, that the sacred liberty of speech, printed or spoken, should be abridged by lodging an arbitrary power to interfere therewith in the hands of the Court or Judge; so long as such criticism or libel is not designed to corruptly influence the mind of the Judge in a cause still undetermined.

There is a marked difference between the attorney and the nonprofessional citizen; the former is as much an officer of the Court as the clerk or sheriff; and his oath of office should lead him at all times and in all places, to encourage and strengthen the Judges and Courts in the discharge of their official duties; but so far as this liberty of speech in connection with judicial action is concerned, his official character in no way affects him; he may talk with his neighbors, and freely comment upon the Judge's official conduct in matters no longer pending, and he may criticise the same through the public press; for such acts he will be answerable only as other citizens are.

But we have found no case, and respondent has cited none, which extends this privilege of comment and criticism to assaults, verbal or physical, upon the Judge in person.

If a case like the one before us were found, in which the Court exonerated the attorney from official reproach, we should hesitate long before following it.

The assault upon the Judge in person, the vile epithets and threats addressed to him, cannot be justified or excused under the right of criticism, nor upon the plea of educating or informing the popular mind concerning his official acts.

We may accept the law as stated by counsel for respondent in their able brief upon this petition for rehearing.

We may say with them that our power to disbar is confined to the statutory causes, and that it can only be exercised for malconduct *in office;* though both of these propositions are ably controverted.

In *Beene* v. *The State*, 22 Arks., 156, the Court, per Chief Justice English, says: "Conceding that it does not appear that the offense is embraced by the statute, yet if the plaintiff made a personal attack upon the Judge on account of his action as such, * * * * there can be no doubt that he deserved to be stricken from the roll for such flagrant misconduct, and that the Circuit Court has the inherent power to disbar therefor, though the offense be not embraced in the statute." And in *The People ex rel Hughes* v. *Appleton*, 105 Ill., 481, under a statute like our own, the Court declare that: "It is not to be held that there are not exceptions; that there are no cases where an attorney's misconduct, in his private capacity, merely, and not in his official capacity, may be of so gross a character that the

Court will exercise the power of disbarment. There is too much authority to the contrary to say that." But it is unnecessary for us to dwell upon this subject, for the issue submitted for trial restricts us in this case to the question of inflicting the penalty for official malconduct.

We may accept counsel's further statement of the law, and admit that the malconduct must have been " designed and calculated to influence and affect the Judge judicially in the discharge of his official duties."

With this law in view, let us briefly examine the specific acts and language of respondent above described and stated.

An article had appeared in one of the morning papers reflecting upon the conduct of respondent in the District Court the day before. The article was signed by no one, and the District Judge, according to the evidence, had no connection whatever with the paper or its management.

Respondent believed himself misrepresented and wronged; he also seems to have thought that relator was in some way responsible for the publication.

With the paper in his hand he sought out the Judge, and made the verbal assault upon him.

The article described a scene in Court during the progress of a trial; it criticised Mr. Green's conduct as an attorney, and the wrongs inflicted thereby, if any, were in his official capacity. The threats made by him to relator were to publish proceedings with which his sole connection was that of counsellor or attorney.

The entire street transaction therefore grew out of, and had direct reference to the judicial action of relator, and the official conduct of respondent.

Respondent claims that his purpose in seeking the interview was to procure from Judge Elliott a statement for publication which should redress the professional wrong inflicted upon him, and prevent the injurious consequences of the article to his professional business; the object of the interview, therefore, was to benefit himself in his *official*, and not in his private capacity.

But these deductions are needless, for we have declared above, that an attorney is bound by the solemn obligation of his oath to assist the Court in its efforts to appropriately

administer the law; and that when he is guilty of such willful acts toward the Judge as are calculated to embarrass and impede these efforts, he is guilty of official misconduct.

Hence, the only question for consideration is, whether respondent's language or conduct was "intended and calculated" to have this effect.

Let us see; his words to Judge Elliott were, "I shall publish the whole affair; how you got angry on the bench; how you imprisoned those poor men, and took money out of their pockets; you ought to have given us an honest judge to try the case; you are a tyrant upon the bench, but when you are attacked upon the street, you are a coward and dare not defend yourself. I will make it hot for you, you cowardly puppy."

Respondent's language in calling relator a cowardly puppy, and declaring that he dare not defend himself when attacked upon the street, seems to indicate that he desired to engage relator in a common street brawl and fight. But this conduct would be so highly unprofessional, that we gladly accept his disclaimer of any such intention.

Passing this, therefore, and also the cruel charge against the Judge of another Court, who had kindly consented to try a troublesome case, without the sl.ghtest obligation to do so, and what do we reasonably understand from the rest of respondent's language?

What does he mean when he says "I will publish the whole affair; how you got angry on the bench," etc.?

The "affair" referred to, and the imprisoning and taking of money, were all occurrences in Court; the threat was to publish these things and thus make it "hot" for Judge Elliott. What did respondent mean by declaring that he would make it hot for relator? Did he make these threats for the purpose of inducing relator to right the wrongs, fancied or real, inflicted by the newspaper article? or, was it his intention thereby to inform relator that he would disgrace him before the public; that by means of the press he would hold up to scorn and ridicule relator's judicial action, and that he would thus degrade relator's judicial standing, lessen the respect due to his position, weaken his influence and efficiency upon the bench, and make it hot for him, *i.e.*, annoy and embarrass him in the discharge of his official duties?

It seems to us now, as it did when the former opinion was written, that there can be no reasonable doubt as to respondent's intention when he uttered these words.

We do not speculate as to whether the publication threatened, had it been made by respondent, would have produced these results.

We are only considering respondent's intention and the reasonable tendency or consequences of his acts.

What effect were these threats calculated to produce? Obviously either to anger and exasperate, or to intimidate the Judge in the performance of his judicial labors.

Judges are human; they have the same emotions and passions as other men; they are as sensitive about insult and injury after as before they begin wearing the judicial ermine; as much as the demand for integrity and ability upon the bench exceeds the demand for like qualities in private life, so much deeper is the sense of injury when these qualities in his official character are called in question. It is the judge's constant endeavor, as it is his duty, to rise in his judicial acts above the influence of passion or prejudice, and to put away from him while upon the bench, all thought of personal wrong or injury; but until he is clothed with celestial attributes, he will not always be able to accomplish this desired end.

Whether respondent's threats and epithets were calculated to intimidate, or whether they tended to exasperate and anger Judge Elliott, is a matter of but little moment; for in either event, their natural tendency was to annoy and embarrass him in the discharge of his official duties, and thus to interfere with the administration of justice in his Court.

Upon the theory that respondent was angered by the newspaper article and made the attack in a sudden heat of passion, we invited him to offer evidence in mitigation; but considering his proofs, in connection with all the circumstances attending the transaction, we are unable to discover anything to materially palliate the offense; it was committed after he had been informed that the Judge had nothing to do with the publication and knew nothing about it until he read the morning paper.

If, therefore, respondent uttered the epithets and threats to relator in a heat of passion produced by the article, that pas-

sion was so unreasonable as to furnish no adequate excuse. But it is sufficient on this subject, to say that though three and a half months have passed since this transaction occurred, respondent still denies the slightest obligation on his part to offer any apology or reparation whatever to relator *as a judge.* Respondent's view of the transaction is that it had no official character or significance whatever; in this view, as already shown, we cannot concur. But governed thereby he has, throughout the entire proceedings, including his argument upon this rehearing, maintained the position that he displayed no want of *official* decorum, and that not the slightest discourtesy was offered to relator in his judicial character.

A word as to respondent's punishment, and I shall have done. He alleges that it is "grossly oppressive and out of all proportion to the offense charged."

*His* construction of the law is that this Court has no power to inflict any other penalty than disbarment; that under the statute, we are compelled to disbar or acquit him. His last words in argument were an expression of his personal preference for disbarment rather than any lighter judgment, and a demand for this, or acquittal. We believe, under all the circumstances, particularly in view of his unyielding attitude, that disbarment was not too severe a punishment for the offense committed; we certainly could not acquit him of all official blame.

Therefore, painful as the duty was, we acceded to his positive and persistent demand.

We are unanimously of the opinion that the rehearing should be denied.

*D. F. Urmy, L. S. Dixon and L. C. Rockwell,* for relator.
*B. F. Rice and B. F. Montgomery,* for respondent.