## IN RE HUPPE.

(No. 6,928.)

(Submitted April 12, 1932. Decided June 1, 1932.)

[11 Pac. (2d) 793.]

*Mr. H. S. Hepner,* Special Prosecutor, argued the cause orally.

*Mr. Wm. T. Pigott* and *Mr. Lester H. Loble,* for Accused, argued the cause orally.

Opinion: PER CURIAM.

In October, 1931, Honorable G. J. Jeffries, Judge of the fifteenth judicial district of this state, filed a complaint in this court charging that Charles F. Huppe, a practicing attor-

ney and county attorney of Musselshell county, within his district, had been guilty of conduct warranting his disbarment, and therein calling attention to the fact that charges had theretofore been filed against the accused, which resulted in a reprimand administered to him by this court, on June 29, 1931.

On request of the Attorney General, H. S. Hepner, Esq., who had acted as special investigator in the former proceeding, was appointed special prosecutor, and the matter was referred to Honorable George Y. Patten, a former member of the court. In due time a hearing was had before Referee Patten, and all matters connected with the charges made were thoroughly aired; in fact, so thorough was the probe that the record thereof covers more than 400 pages of typewritten matter, supplemented by a large volume of documentary evidence.

The complaint contains three charges. On the evidence adduced, the referee exonerated the accused as to charge numbered 2, but declared charges numbered 1 and 3 sustained, and recommended the suspension of Huppe from practice for a period of six months.

The first charge relates to the conduct of the accused while acting as attorney for plaintiff in a divorce proceeding entitled *Rudquist* v. *Rudquist,* commenced in 1927, and in which Huppe secured service upon the defendant wife by publication and thereafter, on November 22, 1927, submitted proof to Judge Jeffries in chambers, after securing the entry of the default of the defendant, and, on the proof submitted, secured a divorce for his client.

The charge of misconduct is that "the plaintiff and his counsel, prior to the hearing had, entered into a collusive agreement with the defendant, and in fraud and collusion, aided and abetted and carried out by the said Huppe, an agreement was made that, notwithstanding the fact that the defendant was then in * * * Roundup, she would make no appearance to the end that the divorce decree in favor of the plaintiff might be obtained." In elaboration of this

charge it is alleged that Huppe and his client testified on the hearing that the defendant was a nonresident, that her last-known address was Wallace, Idaho, and her present address unknown, when in fact she was then in the town of Roundup, where the hearing was had, and had been in communication with the accused and at his office where, just before the hearing, the agreement mentioned was made and signed, all of which was wilfully concealed from the complainant as presiding judge, for the purpose of obtaining "a divorce decree contra to the laws of this state, to wit: by collusion; and did wrongfully and unlawfully and in violation of his oath as an attorney, obtain a decree of the court, based upon testimony known to him to be false and perjured." It is then alleged that in March, 1931, the defendant in the divorce proceeding made application for a modification of the decree, and on a hearing had the complainant "learned definitely and positively of the misconduct of said Charles F. Huppe."

The third charge is that the accused "by remarks, writings and published statements, held the courts of this state, and particularly the court of this complainant and the complainant as the judge thereof, up to ridicule and distrust, * * * in that: A." [Here it is charged that, in the political campaign of 1930, Huppe made and published charges concerning the administration of a bank receivership which reflected upon the court, on which no proof was offered.] "B. That the said Charles F. Huppe, did write a certain letter to a citizen of Musselshell county, Montana, holding high public official position, in which letter, and over his signature, he referred to this complainant who was then such judge as * * * 'this arrogant jackass who acts as judge of the Fifteenth Judicial District,' * * * with the intention of having the same quoted and circulated and with the evident purpose of bringing discredit upon the courts of the state, and particularly the District Court of the Fifteenth Judicial District, and this complainant as judge thereof."

The matter is now before us on motion of the special prosecutor to adopt the findings and recommendations of the referee, and the counter-motion of counsel for the accused challenging the sufficiency of the evidence to warrant the referee's findings as to either charge numbered 1 or numbered 3, and for their rejection and the dismissal of the proceeding.

A fair understanding of the reasons constraining us to make final disposition of this proceeding as hereinafter noted requires that something of the history of the differences heretofore existing, and which still exist, between the accused and his accuser, should be set forth.

The charges here made, and counter charges thereafter made by Huppe against Judge Jeffries, heretofore heard by the same referee and dismissed on his recommendation, to which there was no exception taken, are the culmination of a long and bitter political fight, between these two officials, which reached its apex in the election of 1930, wherein Huppe was opposed for re-election by an attorney then acting as receiver of a defunct bank, under appointment by Judge Jeffries, and in which campaign Huppe seems to have publicly attacked the administration of the receivership in such manner as to cast reflection upon the judge, though, as stated, that matter is not now before us.

In that year three complaints were filed against Mr. Huppe, the first before and the others immediately after the 1930 election, each charging that, in a specific instance, he had used his official position for the purpose of collecting accounts for clients. On these complaints being called to our attention in June, 1930, we appointed Mr. Hepner to investigate "the conduct of Charles F. Huppe as an attorney."

The special investigator reported that, as to the specific charges, letters written by Huppe to debtors of his clients justified the interpretation placed upon them by the complainants. He then reported that "my attention was called to other matters tending to discredit the attorney complained of in matters connected with trials, and I obtained transcripts

of the testimony which I submit herewith, but deem them insufficiently specific enough to positively connect counsel with a knowledge or instigation and hence descredit them." These remarks refer to the Rudquist divorce proceeding made the basis of the first charge herein considered.

Our investigator also reported to us the facts concerning the letter made the basis of charge numbered 3, declaring that Huppe's declarations concerning Judge Jeffries (declarations contained in the letter but not in the charge) "are way beyond the pale of righteous statements to be made by an attorney-at-law and particularly a county attorney against a judge within whose forum he is an officer himself."

The special investigator did not feel that any of the matters investigated should then be made the subject of additional charges or a formal hearing before a referee; instead, he declared: "Mr. Huppe is seriously ill with heart attacks and has to spend a portion of each day in bed; he has a very fine family who are very highly respected in the community, and he himself appears to be an able lawyer. If I am not transgressing the bounds of my duties, I would beg the liberty of recommending admonition of counsel in the way of reprimand, rather than a deprivation of rights to continue in the practice of his profession."

On receipt of this report we commanded Mr. Huppe to ▮▮▮ appear before the court and, on his appearance, the matters specifically charged and the subject of the third charge were canvassed with him and his side heard, after which he was advised that the court agreed with the special investigator as to his culpability in the matters mentioned, and he was admonished that he should in the future refrain from the appearance of using his official position for the collection of claims placed in his hands, and should so govern his utterances thenceforth as to be free from the charge of disrespect to any court of the state, and particularly should be meticulous in his treatment of Judge Jeffries, regardless of, or because of, his personal feeling toward the judge and the reciprocal feeling of the judge toward him. All this he

promised to do, and was dismissed hence with a reprimand. However, in closing the matter, we declared that, "as no formal complaint has been filed against Mr. Huppe because of his criticisms and accusations against Judge Jeffries, this entire matter is held in abeyance and is not in any manner foreclosed."

Counsel for the accused insist that, under the rule *expressio unius est exclusio alterius,* we clearly foreclosed further proceedings as to charge No. 1, and this would ordinarily be true, but no hearing was had on the charges preferred in 1930, and no charge was formally based on the activities of Mr. Huppe in the Rudquist matter; the information secured and reported by the investigator was not sufficiently definite and complete to warrant a ruling upon it, and, when the charges here made were brought to our attention, we, at least impliedly, ruled that the charge was a proper matter of investigation and by our order directed that the referee hear testimony thereon. Further, we feel that all matters touching upon the integrity of the bar of the state should receive the fullest consideration without regard to technicalities.

We therefore hold that the referee was fully justified in receiving and considering evidence respecting charge No. 1.

Turning, then, to the first charge, it will be noted that the misconduct charged is that the accused, as attorney for the plaintiff in a divorce proceeding, wilfully procured the plaintiff and defendant to enter into an unlawful and collusive agreement under the terms of which the defendant was induced to refrain from attending the hearing had, in order that the plaintiff might secure a decree in violation of the law of the state, and that the accused obtained such a decree by fraudulently and deceitfully withholding the facts from the court. It is alleged that the decree was set aside by Judge Jeffries in 1931, when, for the first time, he "learned definitely and positively of the misconduct."

The referee fairly and painstakingly canvassed the evidence in his report, and made findings as to the truth of the matter, which will be later discussed. On the record and on

his findings he concluded and declared "that the evidence in support of the first charge is sufficient to satisfy the requirement that 'the evidence to sustain the charge should be of such a character that it satisfies the court to a reasonable certainty that the charges are true,' [citing cases]."

It will be noted that the charge is that Huppe obtained an illegal divorce decree by means of fraud, deceit, and collusion. The finding of the referee on the testimony taken is that the accused deceived the court by false testimony to the effect that he did not know where the defendant was at the time of the hearing, when in fact he knew that she was in the town where the hearing was in progress, and that he withheld from the court knowledge of the agreement that had been made. The agreement relates to the disposition of certain children, which subject is not mentioned in the charge. It is clear from the record that the defendant had no defense to the complaint on the ground of desertion, and that she had no desire to contest the divorce, but was interested only in securing the custody of her children during the vacation months.

The production of the agreement and admission that the defendant was in town would not have warranted the court in denying a decree on the ground of collusion. "Collusion is an agreement between husband and wife that one of them shall commit, or appear to have committed, or to be falsely represented in court as having committed, acts constituting a cause of divorce, for the purpose of enabling the other to obtain a divorce." (Sec. 5752, Rev. Codes 1921.) There is no suggestion in the record that the evidence respecting the defendant's desertion was false or "perjured"; in fact, by her own admission it was true.

The conclusion that the evidence sustains the charge made cannot be upheld. The findings of the referee could only support a charge that Huppe was guilty of deceit and perjury, for the purpose of securing some other disposition of the children than that upon which the parties had agreed.

On the record we doubt that the learned referee would have accepted the recitation of Judge Jeffries as to his recollection of unreported testimony given more than five years prior to the hearing, as against the more reasonable testimony to the contrary, had he not misconceived the gravamen of the charge, and it would seem, in the light of the lack of motive for testifying falsely and the absence of any reason for concealing from the court either the whereabouts of the defendant or the agreement entered into, that the evidence strongly preponderates against the findings under consideration.

Had the purport of the testimony against the accused been that Mrs. Rudquist had a good defense to the charge of desertion and that Huppe corruptly secured an agreement that she would, although present at Roundup and in a position to interpose that defense, absent herself from the hearing and permit the plaintiff falsely to represent to the court that she was guilty of desertion, and that Huppe did then produce such testimony and corroborate it by his sworn testimony while concealing from the court the actual facts, such testimony would have been material on the question of decree or no decree, and testimony to the effect that the defendant's whereabouts were unknown would have evidenced concealment for the purpose of preventing her from disclosing the corrupt agreement. Such proof would have warranted, not merely the suspension of the accused, but commanded his permanent disbarment. (*In re O'Keefe,* 55 Mont. 200, 175 Pac. 593.)

However, on the hearing of November 22, 1927, the pertinent questions with reference to the defendant were as to whether or not she was a nonresident of the state at the time the proceeding was instituted, in order to determine the right of the plaintiff to secure service by publication (sec. 9117, Rev. Codes 1921), and, if the service was proper, whether the full period of publication and twenty days during which she was entitled to appear had expired (*Smith* v. *Collis,* 42 Mont. 350, Ann. Cas. 1912A, 1158, 112 Pac. 1070). These questions were to be determined before the plaintiff was entitled to introduce any testimony in support of the allega-

tions of his complaint. It was only on this inquiry, preliminary to the entry of default, that testimony respecting the known address or physical situs of the defendant was material, and, on that inquiry, the then place of residence or whereabouts of the defendant was absolutely immaterial; her right to be heard was to be determined with reference to the conditions existing at the time publication of summons was commenced and the subsequent lapse of time. As to these matters it is manifest that no perjured testimony was offered and no deceit practiced upon the court; whether or not the law with respect to service by publication was complied with, the default was entered, and thereafter, and only thereafter, was testimony in support of the complaint adduced.

It will be noted that when, in March, 1931, Judge Jeffries set the decree aside, it was on the ground of failure to observe all that the law required with respect to service of summons, not on the ground that the decree was the result of a collusive agreement.

On direct examination Judge Jeffries testified that, on the hearing had on March 22, 1927, Huppe and his client Rudquist each testified that he did not know where the defendant was at the time of the hearing. In this he was corroborated to some extent by extended cross-examination of Rudquist, during which the witness at times admitted, and at times denied, that on the hearing for a modification of the decree he had, in answer to questions by the judge, admitted that he had testified on the original hearing that he did not know where Mrs. Rudquist was, which statement he had explained as meaning that he did not know where she was "in town," and that, as she had been there for some weeks and the town had but 2,500 inhabitants, he thought the judge, who knew her, knew that she was in town.

Asked on cross-examination to give the entire conversation he had with Huppe at the time of the original hearing, Judge Jeffries said: "Well, the testimony which Mr. Huppe gave was this: I asked him where the defendant was; he said she

was a nonresident, that her last known address was Wallace, Idaho; that he had written letters to her there; that his letters had not been returned, neither had he received any answers to them. That is the substance of the testimony which Mr. Huppe gave. * * * I do not pretend to give the exact words.''

Aside from the judge's statement that he asked Huppe where the defendant was, the testimony bears all the earmarks of testimony given preliminary to the proof in support of the allegations of the complaint, for the purpose of proving service by publication. It contains no statement by Huppe that he did not know where the defendant was.

If, on the preliminary hearing to establish the plaintiff's right to the entry of default, the judge asked the question, ''Where is the woman now?'' as would seem to be indicated by his testimony, the information sought would have been wholly immaterial, and it would seem more plausible that the testimony given, whether in answer to a question by the court or voluntarily, related and was intended to relate only to matters relating to service. If the judge had asked the question suggested, during proof to establish the allegations of the complaint, as he now recollects the circumstances, there is no reason why the witnesses should have repeated statements which must have been made in order to have default entered.

If deceit was practiced and perjury committed, as found by the referee, it could only have been with reference to the disposition of the children. Huppe testified that he embodied the terms of the agreement in a draft of the decree, which he presented to the judge with the statement that the parties had agreed upon the disposition of the children, and he and Rudquist testified that the judge refused to sign the decree, with the statement, ''I will make my own agreements.'' This was denied by Judge Jeffries emphatically on direct examination, but on cross-examination he admitted that the original draft, a copy of which was shown him,

"might have been" submitted to him. The referee found that it was submitted to him.

The disposition of the children, as provided for in the agreement and in the original draft of the decree, was peculiar, in that the custody of the two younger children was to go to the defendant, and the three older children to the plaintiff for the school term, but the defendant was to have them during vacation. Under the decree as signed and entered, this final clause was stricken, and the testimony on behalf of the accused, tacitly credited by the referee by his finding above, is that this was done on order of the judge that he would make his own agreements in that respect.

Under the circumstances there could be no reason or motive back of the alleged concealment from the court of the fact that the defendant was in Roundup and that the parties had agreed in writing as to the disposition of the children, and the rejection of the draft with the statement attributed to the judge would clearly indicate that he was advised of the agreement, which advice clearly indicated that the plaintiff and his attorney had recently been either in communication or consultation with the defendant. We conclude that Judge Jeffries' memory was at fault with reference to what took place some five years prior to the giving of this testimony, and the manner in which he drafted the charge strengthens this conclusion.

Further testimony supporting the position of the accused is that, on the day the decree was signed, Huppe wrote D. L. O'Hearn, Esq., attorney for Mrs. Rudquist, telling of the agreement secured at the suggestion of O'Hearn, and stating: "I then presented the matter and left the disposition of the children under the control of the court pending further application, * * * this upon the court's suggestion after I made the agreement plain to the court. So that the defendant may at any time open the question up if Charles don't live up to his agreement. I hope this meets your approval." Huppe then withheld filing the decree for a period of four days.

Further, the record discloses that all of the facts on which the charge is based were known to Judge Jeffries within a few days after November 22, 1927. He testified that he met Mrs. Rudquist a few days after the hearing on a train on which she was returning to Wallace and he was going to White Sulphur Springs. He had known her for years, and she then told him of her presence in Roundup on the day of the hearing and for some weeks prior thereto, and of the agreement. She told him she had it in her trunk and would send it to him, and this she did within a few days. Yet nothing was done in the matter for more than four years, when, in 1931, after the receipt of a letter from Judge Jeffries, defendant made the application for modification of the decree with respect to the custody of the children to conform to the agreement.

On the whole record and in the light of the variance of the proof from the allegations of the complaint, not perceived by the referee, we are of the opinion that the evidence so strongly preponderates against the referee's findings that those findings cannot be sustained.

It will be observed that the third charge is merely that, in a certain letter to a person holding public office, Huppe referred to Judge Jeffries as an "arrogant jackass," with the intention of "having the same quoted and circulated," and with the evident purpose of bringing discredit upon the courts of the state and particularly upon the court over which the judge presides and upon the complainant.

The letter, introduced in evidence, was written to the representative from Musselshell county, while the legislative assembly of 1931 was in session, and urged opposition to a bill respecting changes in our judicial districts. It contains other reflections upon Judge Jeffries, not pertinent to the charge made, and which we may not consider as supporting the allegations of the complaint.

The epithet made the basis of the charge means no more than that, in the opinion of the writer, the person so desig-

nated is a "very stupid or ignorant person." (Century Dictionary.) The charge as made can hardly be said to constitute the matter which we "held in abeyance" in 1931. Further there is nothing in the record or in the letter to indicate that Huppe intended that his opinion of the judge should be either "quoted or circulated"; the authority in the letter to make certain statements "from the floor of the House" had reference to the other reflections contained in the letter which the writer evidently thought might influence members of the House to oppose the pending bill in so far as it would affect Musselshell county.

As we advised Mr. Huppe in 1931, the writing of such a letter tends to weaken respect for and confidence in our courts, and such conduct should be discontinued. Our views on the subject constituted a considerable portion of the reprimand then administered, and, as noted above, he then promised to refrain from intemperate utterances against Judge Jeffries.

On behalf of the accused, many witnesses—judges, lawyers and laymen—testified that Huppe enjoys a large practice which takes him before many courts and boards, and that he has always been ethical in his practice and courteous and respectful to all courts, judges and boards, including the district court of Musselshell county while Judge Jeffries is presiding.

In view of the circumstances under which the letter was written and the fact that it was the subject of consideration and reprimand in 1931, and in the light of the failure of proof that Huppe intended that his opinion of the judge's knowledge or ability should be either "quoted" or "circulated," we do not feel that the recommendation of suspension should be adopted.

At the time the reprimand was administered we did not intend, and do not now intend, to say that it is not the right or duty of an attorney to make, in the proper forum, any charge against a judicial officer which the facts warrant; on the other hand, there is intended no intimation herein that

Judge Jeffries has, in any manner, violated his oath of office, or that he lacks the proper qualifications therefor.

But let it be understood here that our action as to the ▮ third charge is taken upon the foregoing considerations alone, and not because we condone or excuse attacks upon a judicial officer, without sufficient grounds therefor. The obligation which an attorney assumes when he is admitted to the bar includes the maintenance of respect for our courts and judicial officers. This obligation is not discharged by merely observing a courteous demeanor in open court, but includes abstaining, in and out of court, from the use of insulting, slanderous and libelous language, spoken, written or printed, or other offensive conduct toward judges personally or their official acts. This rule is generally applied only to official acts (*Neel* v. *State,* 9 Ark. 259, 50 Am. Dec. 209), such as stopping a judge on the street and abusing him because of his decision or conduct of a case (*People* v. *Green,* 7 Colo. 244, 49 Am. Rep. 356, 3 Pac. 374), but should be extended to include all misconduct which tends to bring the courts into disrepute. The habit of criticising the motives of judicial officers in the performance of their duties, when the proceedings are not against the officers whose acts and conduct are criticised, as in the case of a direct proceeding of impeachment, tends to subvert the confidence of the community in the courts of justice and in their administration, and when such criticism is made by an attorney, who is an officer of the court, he is guilty of professional misconduct (*Matter of Rockmore,* 127 App. Div. 499, 111 N. Y. Supp. 879).

There is also a broad distinction between fair and temperate criticism and abuse and slander of the courts and the judges thereof. ''While a judicious criticism is a necessary and effective means when used to keep the judges mindful of their duties and to prevent the election of inefficient judges when judges are elected by the people, yet, when carried beyond the limits of truth and fairness, nothing is more certain to destroy the judicial balance of timid judges and to effectually

impair the impartial administration of justice. (*In re Thatcher,* 80 Ohio St. 492, 89 N. E. 39.) Abusive language by an attorney towards the official acts of the court cannot be justified on the ground of guaranteed liberty of speech. (*In re Egan,* 24 S. D. 301, 123 N. W. 478.)'' ''An attorney may freely criticise a candidate for re-election to judicial office as far as the facts justify, and may give opinion adverse to the candidate's qualifications, if made in good faith and confined to decent and respectful statements. The rule covering such campaign utterances is of a qualified privilege, and limited to those made in good faith, and with reasonable cause to believe them to be true, but they are forbidden if the derogatory facts alleged are false and by the utterer known or with ordinary care should be known to be false. (*Thatcher* v. *United States,* (C. C. A.) 212 Fed. 801.)'' (See Bolte's Ethics for Success at the Bar, 25.)

The disbarment of an attorney is for the protection of the public, but discipline by way of suspension for a short period is imposed for correction to the end that, when again permitted to practice, the attorney will not indulge in the offensive conduct for which he is suspended. We feel that Mr. Huppe's experiences during the past year have been such that, in the future, he will carefully guard his tongue and pen from intemperate accusations against any judicial officer, and that no further punishment should, under the circumstances, be imposed.

Accordingly, the motion of counsel for the accused is sustained and the proceeding dismissed.

All Justices concurring.